| 87 | 69 |
|---|---|
| 103 | 503 |

| 87 | 69 |
|---|---|
| 112 | 456 |
| 113 | 190 |

ANTOINETTE T. SANSCRAINTE v. CECELIA TORONGO.

*Ejectment—Identity of premises—Evidence—Adverse possession.*

1. Where land is described as lying in a given direction from a certain creek, and in latter deeds as lying in a like direction from a specified river, the identity of the two streams may be shown for the purpose of showing the identity of the land so described.

2. In an ejectment suit involving a disputed boundary, evidence of the statement by the defendant's husband, in her presence and· without dissent on her part, that, if he had notified plaintiff to make her half of the division fence, she would not have allowed him to move it from the old line, and for this reason he did not give such notice, but made the change at his own expense, is admissible, and warrants the inference that the fence was moved at the instance of the defendant, who claimed title on the trial to the lands inclosed with her own by such removal.

3. Adverse possession of land, up to a marked boundary, for 30 years, establishes the right of the occupant to the premises so occupied, although his original entry may not have been .under any title or claim of title.

4. Evidence of general reputation that the land occupied by a plaintiff in ejectment, who seeks to establish title by adverse possession, was claimed to be owned by him, is admissible; citing *Sparrow v. Hovey,* 44 Mich. 63.

Error to Wayne. (Hosmer, J.) Argued June 5, 1891. Decided July 28, 1891.

Ejectment. Defendant brings error. Affirmed. The facts are stated in the opinion.

*George H. Prentis,* for appellant.

*Hoyt Post,* for plaintiff.

LONG, J. This is an action of ejectment brought in the circuit court for the county of Wayne, where, upon a trial before a jury, the plaintiff had verdict and judgment. Defendant brings error.

The declaration is in the usual form under the statute, claiming the fee of the land. The land is in the township of Ecorse, Wayne county, and is about 8 feet wide on the southerly end, and 14 feet on the northerly end, and 588 feet in length. The controversy grows out of the question as to the true location of the boundary line between the parties to this record.

The declaration describes the land in controversy as situate in the township of Ecorse, county of Wayne, State of Michigan, known and described as follows:

"A strip of land fronting on the 'St. Cosme line road,' (so called), 8 feet in width on said road, and extending in a northerly direction from the north line of said road 588 feet, and being 14 feet in width on the north or rear end of said strip of land, off from the west side of a certain piece or parcel of land described as follows, to wit: Situate on the south end of private land claim No. 114, beginning at a post standing in the south line of said claim (called the 'St. Cosme Line'), the corner on said line of lands formerly owned by James Cicotte and Francis Cicotte; thence running north, 70 degrees 30 minutes west, on said line, 8.64 chains, to a post, the corner of lands belonging to the estate of T J. Campau, deceased; thence north, 29 degrees east, along a fence, the present east boundary of said estate, 11 chains, to the center of the north branch of the River Ecorse;

thence south, 52 degrees 25 minutes east, down the center of said river, 6.60 chains; thence north, 29 degrees east, 8.40 chains, to a post in the north edge of the marsh bordering said river; thence south, 61 degrees east, 2.51 chains, to the west line of land formerly owned by Francis Cicotte; thence south, 29 degrees west, along said west line, 15 chains, to the place of beginning; containing 9.69 acres of land,—as per the report made by the commissioners on partition appointed by the judge of probate for the county of Wayne in the matter of the estate of Simon B. Rousseau, deceased, filed with the said judge of probate on the 12th day of May, 1876, and by him approved and confirmed on the 13th day of May, 1876, recorded on page 97 of Liber 104; which said premises the said plaintiff claims in fee."

The declaration alleges that on or about the 16th day of August, 1888, the defendant entered upon said premises, and ejected the plaintiff therefrom, and unlawfully withholds from the plaintiff the possession thereof. The plea was the general issue.

The plaintiff, to maintain the issue on her part, offered in evidence a deed from Charles Larabelle and wife to Simon B. Rousseau. This is a deed of warranty, and bears date October 12, 1830, and describes the premises as follows:

"A certain tract or portion of land on the south-west side of Mill creek, on the back part of his farm, and being part of the farm which the said Charles purchased of James Cicotte, and comprehending the whole of the land of said farm lying south-west of said Mill creek, and containing 8 or 10 acres, be the same more or less."

To the introduction of this deed in evidence objection was made by defendant's counsel, for the reason that it did not describe the land in controversy in this suit. It was admitted in evidence by the court upon the statement of counsel for plaintiff that it would be shown that it did cover the land in controversy. To this ruling defendant excepted.

Plaintiff then offered in evidence a report of the com-
missioners on partition in the estate of Simon B. Rous-
seau.    This report was also objected to by defendant's
counsel, upon the ground that it did not describe the
lands in controversy.    This report was received in evi-
dence upon the statement of counsel that it covered the
lands in controversy.    It appeared from this report that
the commissioners partitioned the land described in the
proceeding among the children of Simon B. Rousseau,
by which partition it is claimed the plaintiff, who is a
daughter of Simon B. Rousseau, had partitioned to her
the lands described in the declaration in this cause.
The land described in this report is as follows:

"All the certain parcel of land situate on the south
end of private land claim No. 114, beginning at a post
standing in the south line of said claim (called the ' St.
Cosme Line'), the corner on said line of lands formerly
owned by James Cicotte and Francis Cicotte;    thence
running north, 70 degrees 30 minutes west, on said line,
8.64 chains, to a post, the corner of lands belonging to
the estate of T. J. Campau, deceased;    thence north, 29
degrees east, along a fence, the present east boundary of
said estate, 11 chains, to the center of the north branch
of the River Ecorse;    thence south, 52 degrees 25 minutes
east, down the center of said river, 6.60 chains;    thence
north, 29 degrees east, 8.40 chains, to a post in the
north edge of the marsh bordering said river;    thence
south, 61 degrees east, 2.51 chains, to the west line of
lands formerly owned by Francis Cicotte;    thence south,
29 degrees west, along said west line, 15 chains, to the
place of beginning;    containing 9.69 acres of land."

· The plaintiff claims that the property described in the
declaration is a part of the property set off to her by
the report of said commissioners.    The estate of Simon
B. Rousseau was administered and closed.

The plaintiff's testimony tended to show that her
father, Simon B. Rousseau, took possession of the lands
described in the Larabelle deed some time prior to the

year 1849; that he worked the lands, and had sole and uninterrupted control and possession of them, from that time up to the year 1875, at the time of his death; that his possession was open and notorious during all those years; and that at his death, after the partition proceedings were had, the plaintiff went into immediate possession of her portion of the Rousseau lands, and that she has continued in possession thereof ever since. It appears, further, that in the year 1849 Joseph Campau was the owner of the lands adjoining the premises in controversy upon the west; that in the year 1849 one Hubert Champagne leased these lands from Joseph Campau; and that, before his going upon the Campau premises, a rail-fence had been erected on what was called the line between the Rousseau lands and the lands of Joseph Campau. The claim of the plaintiff is that this rail-fence occupied the true boundary line between her father's lands and the Campau lands, and that from that time forward the fence continued upon that line up to the year 1888, at which time the defendant in this suit and her husband removed it, and erected a board fence, starting at a point 8 feet east of the rail-fence at the south end, and at the St. Cosme line road, and running north to a point 14 feet east of the rail-fence at the north end, and inclosing with the defendant's lands the lands in controversy in this suit; that this was done without plaintiff's knowledge or permission. That a better view of the premises and their position may be had, the following map is inserted:

The defendant's. claim upon the trial was that the plaintiff's proofs failed to show ownership in plaintiff's father to the lands in controversy, and that the only claim that plaintiff asserted was by occupancy; that the deed from Larabelle and the probate proceedings did not show title in the plaintiff; and that the court was in error in holding that 15 years' possession, without any title and claim of right, would make title in the plaintiff. The defendant also sought to show upon the trial that the board fence erected in 1888 was on the true line between the Rousseau and Campau lands. For that purpose she put in evidence a deed made by Augustus T. Chapaton and wife to the defendant, dated August 29, 1885. This deed described lands as follows:

"That portion of lot No. 11 of the subdivision of private claim No. 114 described as follows, to wit: Beginning at a point in the westerly line of said lot where said westerly line intersects the center line of the

' St. Cosme Line Road' (so called); thence easterly, along the center line of said St. Cosme line road, to the easterly line of said lot No. 11; thence northerly, along the easterly line of the said lot No. 11, to the center line of 'Pepper's Road' (so called); thence westerly, along the center line of said Pepper's road, to the westerly line of said lot and claim; thence southerly, along the said westerly line, to the place of beginning,—it being the intention to convey all that portion of said lot lying between said St. Cosme line road and the Pepper's road, containing 5.53 acres, be the same more or less."

The defendant called as a witness Mr. E. J. Goodell, a surveyor, who gave testimony tending to show that private claim No. 114 was divided into 11 lots several years ago; that he knew the land claimed by defendant in her deed, and, about a year before the trial of the cause, had surveyed it out; and that the board fence stood upon the easterly line of defendant's land. This surveyor claims to have found the original stake at the south-west corner of private claim 114, and to have taken that as a starting point in making his surveys; and that, starting at that point, the board fence was put upon the true boundary line between plaintiff's and defendant's lands. Defendant also introduced testimony tending to show that at the time Mr. Champagne occupied the Campau tract of land, in 1865, the rail-fence was moved from about where the board fence now stands, westward upon the Campau tract, from 6 to 12 feet, for the purpose of cleaning up the brush in the fence corners, and that Mr. Rousseau assisted in moving the fence over. Defendant also offered in evidence deeds tracing the title of the Campau lands from Joseph Campau, through A. T. Chapaton, to the defendant. Defendant also introduced testimony tending to show that after Hubert Champagne moved off the Campau lands, in 1865, Simon B. Rousseau rented the Campau lands, and became a tenant under Campau of those lands for several years subsequent thereto; and that,

while he was such tenant, he moved the rail-fence from its true line over upon the Campau lands, to the point where the witnesses for the plaintiff claimed the old rail-fence stood.

Plaintiff introduced a great many witnesses upon the trial, who testified positively that they had known these premises from 25 to 35 and 40 years and upwards, and that during all that time the old-rail fence .had stood uninterruptedly, up to the year 1888, upon a line now claimed by the plaintiff to be the line between the lands of the parties to this cause, and that it was the same fence that was torn down and removed by defendant's husband.

The plaintiff was called as a witness in her own behalf, and testified that they put the board fence inside and upon her possessions, and that at that time the defendant cultivated the lands and claimed them, although no one was living upon the lands.   She was then asked by her counsel:

"What have you heard the defendant say with reference to the moving of that fence?

"*A.* She didn't say much, but her husband did,—her husband, in her presence."

Counsel for defendant objected to what defendant's husband said, and the witness was permitted to answer under his objection and exception, and answered as follows:

"He said that, if he had notified me to make my half of the fence, I would not have let him move the fence from the old line; therefore he did not notify me, but put up the whole fence at his own expense and work; and, moreover, if he had minded what one of the neighbors said, he would have taken more yet."

Plaintiff also introduced testimony tending to show that the lands described in the Larabelle deed are the same lands described in the declaration, and that the

Ecorse river was formerly known in the earlier days as "Mill Creek," and that the Mill creek described in the deed is the same stream of water now known as the "Ecorse River;" and the plaintiff testified, as a witness upon the stand, that the parcel of land described in the Larabelle deed is the same parcel as described in the partition proceedings in her father's estate, and that it is the same land which she now occupies, and is described in the declaration.

At the close of the testimony, the defendant asked the court to instruct the jury as follows:

"2. Possession for 15 years and upwards, unless it is by virtue of some title and claim of right, and the possession is open, notorious, and hostile to the opposite party or the party in possession, will not entitle a party to a verdict.

"3. A line or boundary fence, standing in a certain place for 15 years and upwards, does not make a line, and does not bind the parties in interest, unless it is on the correct line, unless the parties assent to it as the correct line, or unless they occupy on the respective sides, claiming it to be correct.

"4. If Simon B. Rousseau changed the fence, or caused the fence to be changed, while he was a tenant of Joseph Campau, the plaintiff cannot recover.

"5. Putting up a fence by a man who owns land on one side of a correct line, and who occupies the land on the other side as a tenant of the owner, will not establish a line, and will not enable the person who puts up the fence to hold the land by possession."

The court instructed the jury as follows:

"If you find that the line fence has not been disturbed until the time which has been testified to by the plaintiff and the plaintiff's witness, then, gentlemen of the jury, you might infer from the testimony which was given by the plaintiff or one of her witnesses that the husband of the defendant said in her presence that he had moved it, and yet, if he had followed his neighbor's advice, would have taken something more, you may infer from that statement that it was moved at the instance of the

defendant, and under those circumstances the plaintiff would be entitled to recover.   *   *   *   *   *   *   *

"If you find that the fence has been removed since 1864, then unless you find that it was held by the plaintiff and her father for more than 15 years in adverse possession, and that the possession of herself and father was open, notorious, and hostile, and under claim of right, why, then, gentlemen of the jury, she would not be entitled to recover, if you find the true line of lot 11 ran at any other point. In other words, I charge you, as requested by defendant in this case, that possession for 15 years and upwards, unless it be by virtue of some title or claim of right to the possession, open, notorious, and hostile to the opposite party or the party in possession, will not entitle the party to a verdict. I charge you, also, that a line or boundary fence, standing in a certain place for 15 years and upwards, does not necessarily make a line, and does not bind the parties in interest, unless it is on the correct line, unless the parties either acquiesced in it or assented to it as the correct line, or occupied their respective sides, claiming it to be correct. I charge you, also, that if Simon B. Rousseau moved the fence, while he was a tenant of Mr. Campau, over onto the property of Mr. Campau, the statute of limitation could not run so long as that tenancy continued; and unless he claimed after the termination of that tenancy and held possession under claim of title, and unless such possession was open, notorious, and hostile, the plaintiff could not claim any right under such possession. So that it comes down to this, gentlemen of the jury: If you find that the father of the plaintiff, and the plaintiff after the death of her father, occupied the piece of ground which was given to her by her father, and you find that the fence which divided the property from the property now owned by the defendant in this case stayed there for fully 15 years prior to the time it was removed by the defendant, if you find that it was removed by the defendant, and the plaintiff and her father occupied that property under claim of title, and that such occupation was open, was notorious, was hostile, and, when I say hostile, I mean adverse to all other persons,—why, then, gentlemen of the jury, under those circumstances, the moving of the fence would be a tort on the part of the defendant, if she did cause the fence to be moved, and, under such

circumstances, the plaintiff would be entitled to recover; but, unless you find these facts, then, under those circumstances, the verdict will be for the defendant."

At this point in the charge counsel for defendant asked the court to charge that,—

"Even if the fence stood there 15 years, and the adjacent owner acted on the supposition that the fence was on the correct line, unless it appears that they occupied on the respective sides of it, claiming it to be accurate, the plaintiff cannot recover."

To that request the court responded:

"That is true, gentlemen of the jury; but when I say, 'claiming it to be correct,' does not necessarily mean that it is claiming it to be the true line,—that is, the true line of lot 11,—but claiming it to be the accurate division between the properties."

Defendant's counsel thereupon requested the court further to charge the jury—

"That there is no evidence that there was any claim on the part of Mr. Rousseau at any time that this fence stood on the correct line; no claim on the part of Mr. Rousseau and the adjacent owner, or any of Mr Rousseau's heirs or grantees, so far as the evidence shows. I simply say this: There is no evidence here tending in the slightest degree to show that Mr. Rousseau ever claimed that this fence was on the correct line."

To this the court responded that,—

"The evidence of Mr. Champagne was that, in 1849, he went to work there and moved the old fence which was there over onto the correct line, as he said."

The counsel for defendant then remarked to the court:

"If the fence was put there, it was put where the board fence now is, and it has been moved since; but that does not make any difference, because the proposition is this: That Mr. Champagne had no right to fix the line for Mr. Campau, and Mr. Champagne, a tenant, fixing the line, and Mr. Rousseau fixing the line, even if they agreed to it,—but there is no evidence that they agreed to it,—would not establish a line."

To which the court responded:

"There is no question that a tenant would have no implied authority to fix a line for the landlord, but at the same time where the line was fixed by the tenant, and where the line stayed there, fixed by acquiescence at least of the other party, between the tenant and the other party, and the line stayed there, if the other party acted upon it, and held open, notorious, and hostile possession of all that was beyond it, why unquestionably it would be fixed so far as the landlord is concerned. * . * * * In this case, if you believe the testimony of the plaintiff's witnesses in that regard that he held up to that fence, that it was established between himself and Mr. Champagne, why it would be fixed, whether it was fixed by adverse possession, or whether it was fixed by actual agreement, or by acquiescence."

Some 20 errors are assigned upon this record. But few of them, however, are discussed by defendant in his brief, and he says he does not care to trouble the Court with some of the errors assigned, as he does not deem them important, after a more careful examination.

The 1st, 2d, 3d, and 5th assignments of error relate to the admission in evidence of the Larabelle deed and partition proceedings in the Wayne probate court, and the testimony of the plaintiff to identify the land described in the Larabelle deed as the land described in the partition proceedings and in the declaration. We think this evidence was competent. It is certainly competent to show that what is now called the "Ecorse River" was formerly known as "Mill Creek," and the description in the Larabelle deed is of a tract of land on the south-west side of Mill creek, and is a part of the farm which Larabelle purchased of James Cicotte, and comprehending the whole of the James Cicotte farm lying south-west of Mill creek. If Ecorse river and Mill creek are identical, it will be observed, from the plat heretofore set out, that the lands claimed by plaintiff as lying south-west of Ecorse river, being the premises described in the declara-

tion, are identical with the lands described in the Larabelle deed as lying south-west of Mill creek. Mr. Bartlett, a surveyor who made the partition in the Rousseau estate, as one of the commissioners, testified that he located this very parcel of land, which he calls "Netty's Point," from the Larabelle deed; that he took the south part of the Larabelle farm, lying south and west of the creek, as inclosed, and made the measurements according to the inclosure, and himself made the description in the partition; that he had been on the premises again the same morning that he gave his testimony, and identified the premises by the new fence and the track of the old fence. Other witnesses also testified to the location of these lands in reference to the Ecorse river, formerly known as "Mill Creek." There was no error in receiving this testimony for the purpose of this identification. The lands were not only known and described as lands lying south-west of Ecorse river, but as lying south-west of Mill creek, and Ecorse river and Mill creek are conclusively shown to be the same stream.

The sixth and eighteenth assignments of error relate to the ruling of the court in permitting the plaintiff to testify to what the defendant's husband said to her about moving the old line fence, and the instruction of the court to the jury that they might infer from such statement that the fence was moved at the instance of defendant. The evidence was admitted upon the claim that it was justified by the fact that defendant was present when it was said. We think this evidence was competent, and the court was not in error in directing the jury that they might infer from this statement that the fence was moved at the instance of defendant. The defendant was present at the time of the statement, and, so far as shown, made no claim but that the fence was moved by

her husband with her knowledge and with her assent; and she made no claim upon the trial but that it was moved there with her approbation by her husband, but, on the contrary, claimed the premises westward of the fence, and between that and where the old rail-fence stood. If she did not consent to her husband moving the fence over upon the plaintiff's lands, it was her duty, when plaintiff made claim to the lands, to disclaim any interest in them. Instead of that, she is now claiming title and ownership of the very lands which her husband inclosed with her lands by the building of this new board fence.

Defendants counsel further contends that the court was in error in modifying the second request to charge; that the request should have been given as presented; that possession for 15 years and upwards, unless it is by virtue of some title and claim of right, and the possession is open, notorious, and hostile to the opposite party or the party in possession, will not entitle the party to a verdict; and that the court was in error in modifying this request by adding, "or claim of right to the possession." Defendant's counsel contends that the plaintiff could only recover in this cause by reason of possession, coupled with some title and a claim of right. There was no error in this modification. The theory of the plaintiff was that her father went into possession under the Larabelle deed, claiming title to the lands now in controversy; that he used and cultivated them for more than 30 years, with a marked boundary between his lands and the Campau lands by this rail-fence, which stood there continuously and uninterruptedly from the year 1849 up to 1888; and that during all those years her father, and she after his death, used, cultivated, and occupied those very lands, claiming a right, not only under claim of

title, but by open, notorious, and hostile possession as to all the world; and the court was not in error in modifying the defendant's request to charge, for, although the plaintiff's father may not have gone into possession under any title or claim of title, yet if he held the lands in controversy, and the whole of them, and used, occupied, and cultivated them, claiming a right thereto hostile and adverse to every other person, and he continued to occupy them for more than 30 years, up to the rail-fence, his rights in the premises became established by such adverse possession, although he may not have gone into possession under any title or claim of title at the time of his entry; but, as we have said, we think the plaintiff's testimony shows that the Larabelle deed and the partition proceedings sufficiently describe the lands mentioned in the declaration, and therefore plaintiff's father and plaintiff were occupying, using, and claiming rights in the premises, not only by adverse possession, but under a claim of title.

We think the court was not in error in modifying the defendant's fifth request, as he did in his general charge, which we have heretofore set out. If the fence was moved by plaintiff's father, in 1865, over upon the Campau lands as claimed, while he was a tenant of Mr. Campau, the court directed the jury that the statute of limitations would not run so long as that tenancy continued; and unless he claimed after the termination of the tenancy to hold the land by adverse possession under claim of title, and such possession and claim of title was open, notorious, hostile, and adverse, and had continued for more than 15 years after the termination of the tenancy, the plaintiff could not recover. There was no error

in this instruction and modification of the request. The testimony abundantly shows that, after the tenancy had terminated, if one ever existed, a fence stood there for more than fifteen years prior to the time that the board fence was built, the plaintiff and her father occupying, claiming, and cultivating the lands during all that time.

Some claim is also made that the court was in error in permitting the plaintiff to introduce testimony by general reputation showing that these lands, up to the old rail-fence, were claimed to be owned by plaintiff and her father up to the year 1888. There was no error in this. *Sparrow v. Hovey,* 44 Mich. 63.

The seventeenth assignment of error relates to that part of the general charge of the court in which the court read to the jury from the case of *Stewart v. Carleton,* 31 Mich. 270. The claim is that the reading of what was said by Mr. Justice CAMPBELL in that case in reference to surveyors prejudiced the rights of the defendant, as it had reference to the survey made by the defendant's surveyor, Goodell, in locating, as he claimed to have done, the true boundary line between the parties. The plaintiff's case was not rested upon the question solely of the true boundary line, but was submitted to the jury principally upon the question of the established boundary in the year 1849, which had continued to be recognized and acquiesced in as the boundary between these lands from that time up to the year 1888, and we cannot see how the defendant's case could be prejudiced by the court reading from that opinion.

Taking the case as a whole, we are unable to discover any error. It appears to us, from the whole record, that the case was fairly tried, and the rights of the defendant fully protected under the charge of the court as given.

The judgment must be affirmed, with costs.

MORSE, McGRATH, and GRANT, JJ., concurred with LONG, J.

CHAMPLIN, C. J. I concur in the result.