749 N.W.2d 901 (2008)
16 Neb. App. 677
Mark R. HOLOUBEK and Willow A. Holoubek, Appellants,
v.
Patricia K. ROMSHEK et al., Appellees.
No. A-06-1146.
Court of Appeals of Nebraska.
May 20, 2008.
*904 Stephen D. Mossman, of Mattson, Ricketts, Davies, Stewart & Calkins, Lincoln, for appellants.
James M. Egr, of Egr & Birkel, P.C., David City, for appellees.
SIEVERS and MOORE, Judges.
SIEVERS, Judge.
Mark R. Holoubek and Willow A. Holoubek filed a complaint in the district court for Butler County seeking to rescind their purchase of real estate from Patricia K. Romshek, Elsie Grubaugh, and Dick Grubaugh (collectively Grubaughs). After the closing of such sale, it came to light that the owners of the land to the south of the land purchased by the Holoubeks claimed the southernmost 27 feet of the Holoubeks' approximately 6.3-acre rectangular tract purchased from the Grubaughs. The evidence traces this "problem" to a scrivener's error in a deed filed on August 3, 1922. For efficiency, we will refer to this unusual circumstance as the "problem," and we will use 27 feet as a convenient generalization although the surveyed dimensions show that the measurement varies by a matter of a few feet, plus or minus. The district court denied rescission, and the Holoubeks have appealed.

FACTUAL BACKGROUND
On December 29, 2004, the Holoubeks agreed to buy, and the Grubaughs agreed to sell, real estate via a written contract which described the property as follows:
Outlot 2 IN PT W ½ SW ¼ +/- 4.86 Acres West Addition, in Butler County, Nebraska.
West Half of the Southwest Quarter (W ½ SW ¼) of Section 19, Township 15, North, Range 3, East of the 6th P.M., Butler County, NE. +/- 1.5 Acres West Addition.
The purchase price was $30,000, and closing was set for January 17, 2005. We quote portions of the contract which are crucial to the decision:
8. TITLE INSURANCE: The Seller will order a Title Insurance Policy with the cost to be paid half by the Seller and half by the Buyer. The Seller will be given a reasonable time to correct any defects in the title.
. . . .
11. REPRESENTATION BY SELLER. The Seller makes the following representations and warranties to the Buyer, all of which survive the closing:
(a) At the time of closing, the Seller will have good and clear marketable title to the property sold, assigned and conveyed *905 hereunder, free and clear of all liens, charges, encumbrances and pledges.
. . . .
(c) Upon closing, no other persons or entities will have any interest in the property being conveyed hereunder, except as provided herein.
. . . .
(h) The legal description accurately and adequately reflects the property being conveyed.
(i) That the foregoing representations and warranties are made by the Seller with the knowledge and expectation that the Buyer is placing reliance thereon.
The money was paid, and the sale was closed without incident.
The Holoubeks intended to subdivide the tract, and after the closing, for that purpose, they engaged the services of Richard Ronkar, who has been the Butler County surveyor for approximately 25 years. In the course of working with Ronkar, the Holoubeks first became aware of the "problem."
The "problem" involves the tract lying to the south of the Grubaugh property purchased by the Holoubeks. The two tracts are the same length, but the Holoubek tract is wider than the adjacent tract owned by Rick Lord and Debra Sypal. As explained by Ronkar, at least on paper, the Lord-Sypal tract overlaps approximately 27 feet to the north onto the Holoubek tract. The fact of such "overlap" was discerned by Ronkar, and he so advised the Holoubeks; the Grubaughs do not dispute this evidence in any way. The record is clear that it was not until after the Holoubeks began the platting process of the tract they had purchased from the Grubaughs that the Grubaughs and Holoubeks became aware of the "problem."
According to Ronkar's testimony, he did not advise the Holoubeks of what he already knew about the "problem" at the time that the Holoubeks engaged him on January 10, 2005, to do the preliminary plat for the subdivision. As we understand the testimony, Ronkar, in his work as county surveyor, had previously become aware of the "problem," albeit apparently not how or why it occurred. After being engaged by the Holoubeks, Ronkar undertook an investigation of the records and surveys to determine the origin of the "problem," and after he had done so, he then advised the Holoubeks of the overlap and why it had occurred. We note that Ronkar's testimony is clearer if read in conjunction with exhibit 44, his survey and field notes filed with the Butler County clerk in the survey record repository on September 19, 2005. In any event, the first survey and plat was recorded on April 10, 1906 (for convenience, we deal with the widths of the tracts). Thus, as of such date, a 9.66-acre tract which was 647 feet wide was platted and recorded. On May 12, 1913, a deed was filed conveying the north 320 feet of the 9.66-acre tract; this is the tract that ultimately became the Grubaugh tract that was later sold to the Holoubeks. On March 16, 1915, a deed was filed conveying the south 327 feet of the 9.66-acre tract, and such deed describes that the tract extends south 327 feet to "`the north line of a public road.'" Thus, as of 1915, all 647 feet of the original tract is accounted for by these two conveyances.
Then, a third transaction occurred on September 8, 1919, when a survey and plat was recorded of "Hall's Addition" showing 27 feet of "parquet" on the north side of a public street, and from there, 12 lots 140 feet deep extended to the norththis represents the southernmost portion of the original tract. These three transactions constitute a division of the 647-foot-wide *906 tract we started with, in that the southernmost 167 feet was platted as residential lots, Hall's Addition, leaving a tract 160 feet wide lying north thereof (ultimately the Lord-Sypal tract), and then to the north of that tract, a tract 320 feet wide (the Grubaugh tract).
We quote extensively from Ronkar's field notes, Nos. 6 through 8 from exhibit 44, which explain the inception of the "problem," whereby the land lying to the south of what the Holoubeks bought from the Grubaughs was expanded from its actual width of 160 feet to what the title record presently shows as a tract that is 187 feet wide. Thus, stated simply, on paper, there is a piece of ground approximately 27 feet by 650 feet, but in reality, it does not exist. Ronkar's field notes state:
6) 8-3-1922; Deed filed in Deed Bk. 62 p. 281, conveying 187', more or less, lying north of the Hall's Addition lots. In my opinion, this deed description contains an error. I believe the person who wrote this description properly used the 327' figure from [field note No. 4, the March 16, 1915, deed], and then subtracted the 140' deep lots, to equal 187' remaining, when the correct computation should have been the 327' figure, less 27' Parquet, less the 140' deep lots, to equal 160'. This deed description begins 320' south of the south line of the F.E. & M.V. Railroad.
7) June 1975; Survey plat by Erickson of this subject property, shows he established monuments on the south line of this subject property, 187' north of the north line of Hall's Addition. This appears to be a perpetuation of the previous, erroneous deed description. Erickson's plat note states that the description "includes all of that real estate conveyed in deeds recorded in Book 92, pages 555 and 556". I believe that note is also in error, as said deed description calls for the 320', along with a 100' strip of abandoned railroad, equaling a total of 420'. Erickson's plat shows the east line of this subject property as being only 394.24' wide, a difference of 25.76'.
8) Nov. 1977; Survey plat by Erickson of the parcel lying south of the subject property, shows said parcel [Lord-Sypal tract] having a width of 187', again perpetuating the previous, erroneous deed description.
Ronkar concludes his field notes by stating that "[t]he conflict over the strip of land along the south line could not be resolved by the adjacent owners [the Holoubeks and Lord and Sypal], and this survey was abandoned, as directed by [Mark] Holoubek." Ronkar explained that in his opinion, the writer of the deed in 1922 missed the 27 feet "parquet" of the street, which was adjacent to the south edge of Hall's Addition, and that such error was thereafter perpetuated by 1975 and 1977 surveys, resulting in the Lord-Sypal tract being approximately 27 feet wider (on paper) than it should be. The error has the effect of adding 27 feet to the north edge of the Lord-Sypal tract  27 feet which does not exist.
Given our resolution, we need not exquisitely detail the Holoubeks' attempts to resolve the "problem." However, the long and short of it was that Lord and Sypal rejected the Holoubeks' offer of 13½ feet of the "problem" strip in settlement of the "problem." The Holoubeks abandoned their subdivision plan and filed this lawsuit for rescission of the contract and deed, repayment of their $30,000 purchase price, plus some $6,308.10 in expenditures to develop the tract.

TRIAL COURT DECISION
The trial court determined that rescission was not available in this case, citing the following facts and circumstances: The *907 agreement did not contain an express rescission clause, the Holoubeks were the drafters of the agreement and were familiar with the land, the Holoubeks did not have the property surveyed until after closing, the Grubaughs were unaware until after closing of any claim of the landholders to the south, the Grubaughs never committed any fraud, it is the deed to the Lord-Sypal property which is in error, and there was no mistake in the deed given to the Holoubeks. The district court made three additional findings, which we will delineate and discuss further in the analysis section of our opinion.

ASSIGNMENTS OF ERROR
The Holoubeks set forth 11 assignments of error. Summarized and restated, the assignments of error are that the district court erred (1) in failing to find that the Grubaughs breached the agreement by failing to provide a good and clear marketable property and by failing to ensure that no other person would claim an interest in the property conveyed; (2) in failing to find negligent misrepresentation by the Grubaughs that they were providing good and clear marketable title and that no other person would claim any interest in the property; (3) in failing to rescind the agreement and warranty deed for either breach of the agreement or negligent misrepresentation; (4) in finding that the boundary dispute did not make the property uninhabitable for all practical purposes; (5) in finding that the Holoubeks did not give the Grubaughs a reasonable time to cure the defect; (6) in finding that the Holoubeks acquiesced in or ratified the agreement by attempting to settle the issue with Lord and Sypal and by agreeing to a settlement offer which would give up a portion of the property; and (7) in failing to award damages, including interest.

STANDARD OF REVIEW
In an appeal of an equitable action, the appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses. Bauermeister v. McReynolds, 253 Neb. 554, 571 N.W.2d 79 (1997).

ANALYSIS

Introduction.
At the outset, we note that in the pleadings and the Holoubeks' pretrial statement of issues, the Holoubeks raised issues of negligent misrepresentation. We also note that the Grubaughs in their appellees' brief before this court, under the guise of examining all of the circumstances surrounding the purchase, seem to frame the matter in language of fault or blame. For example, the Grubaughs' brief states:
[Mark] Holoubek is what people call a "wheeler dealer" and needed to move things along to make a quick buck. The record is filled with Mark Holoubek[']s touting his background. The problem is Mark Holoubek wanted to be his own lawyer, his own real estate broker, and his own developer and cut corners for a quick buck. Equity does not allow someone to benefit from [his] own mistakes and errors. Remember Holoubek did not have the Tract surveyed until AFTER closing.... No experienced developer and land purchaser goes forward without a survey, goes forward without knowing the zoning regulations, goes forward to close until ALL matters are examined before closing and DOES provide for those contingencies. Holoubek *908 did none of these things with the purchase.
Brief for appellees at 11-12.
As pointed out above, in our section entitled "Trial Court Decision," the trial court likewise found some of such concepts advanced by the Grubaughs significant. For example, the "Order of Dismissal Following Trial" notes that the purchase agreement did not contain an express rescission clause and that the Holoubeks drafted the agreement, were familiar with the land, and chose not to have it surveyed until after closing. However, in our view, the initial analytical focus must be on two key provisions of the "Agreement for the Sale of Real Estate" entered into by the parties on December 29, 2004, because the analytical calculus for the case must reflect that this is essentially a breach of contract claim. Therefore, our analytical approach to the case is different from that of the district court.

Marketable Title.
In paragraph 11 of the agreement, the Grubaughs represented and warranted to the Holoubeks that "(a) [at] the time of closing, the Seller will have good and clear marketable title to the property" and that "(c) ... no other persons or entities will have any interest in the property being conveyed." Therefore, these contractual provisions form the first key point of analysis.
The first crucial question is what the term "marketable title" means. Initially, we note that the case law makes it clear marketable title and merchantable title are synonymous and that the terms are sometimes used interchangeably. We quote at length from the thorough exposition of the concept of marketable title by the Nebraska Supreme Court in Bliss v. Schlund, 123 Neb. 253, 257-58, 242 N.W. 436, 438 (1932):
"A clear title means that the land is free from [e]ncumbrances. Roberts v. Bassett, 105 Mass. 409. A good title is one free from litigation, palpable defects and grave doubts, comprising both legal and equitable titles, and fairly deducible of record. Turner v. McDonald, 76 Cal. 177, 9 Am. St. Rep. 189, 18 Pac. 262; Reynolds v. Borel, 86 Cal. 538, 25 Pac. 67. A clear title means a good title (Oakey v. Cook, 41 N.J.Eq. 350, 7 Atl. 495), and a good title means a marketable or merchantable title (Irving v. Campbell, 121 N.Y. 353, 8 L.R.A. 620, 24 N.E. 821). A contract to convey in fee simple, clear of all [e]ncumbrances, implies a marketable title (Bell v. Stadler, 31 Idaho, 568, 174 Pac. 129), and a marketable title is one of such character as assures to the purchaser the quiet and peaceable enjoyment of the property and one which is free from [e]ncumbrances (Barnard v. Brown, 112 Mich. 452, 67 Am. St. Rep. 432, 70 N.W. 1038)." Ogg v. Herman, 71 Mont. 10, 227 P. 476.
It has been held that a merchantable title need not be free from every technical defect, but the test is whether a man of reasonable prudence, familiar with the facts and the questions of law involved, would, in the ordinary course of business, accept such a title as one which could be sold to a reasonable purchaser. Cappel v. Potts, 192 Ia. 661, 185 N.W. 148.
The terms "marketable" and "merchantable" title are practically synonymous, and mean a title in which there is no doubt involved, either as to matter of law or fact, and a purchaser who contracts for a marketable title will not be required to take it if there be color of outstanding title and he may encounter the hazards of litigation. Hess v. Bowen, 237 Fed. 510; Eaton v. Blackburn, 49 Or. 22, 88 P. 303; Dalzell v. Crawford, *909 1 Pars. Eq. Cas. (Pa.[1842]) 37, 45; Herman v. Somers, 158 Pa. St. 424[, 27 A. 1050], 38 Am. St. Rep. 851 [(1893)]; Ormsby v. Graham, 123 Ia. 202, 98 N.W. 724 [(1904)].
Bliss v. Schlund, supra, was followed in Northouse v. Torstenson, 146 Neb. 187, 19 N.W.2d 34 (1945). In Northouse, the trial court found that the plaintiff had not tendered an abstract of title reflecting a merchantable title. The Nebraska Supreme Court affirmed, saying:
It appears to this court that no other judgment is possible under the law and the facts, for a purchaser cannot be made to buy a lawsuit in such a case, even if he might win in the end. A title to real estate, to be good, satisfactory or marketable, should be free from reasonable doubt, either in law or in fact. The judgment of the district court is affirmed.
Northouse v. Torstenson, 146 Neb. at 192-93, 19 N.W.2d at 36-37.
Recalling the facts that we have recited in considerable detail about the approximately 27-by 650-foot strip on the south edge of the Grubaugh property to which Lord and Sypal make claim by virtue of their deed, which perpetuates a scrivener's error from 1922, we find that no judgment is possible under the facts of this case, other than to conclude that at the time of closing, and as well as at trial, remembering the express proviso of the contract that the warranty of marketable title survives the closing, the Grubaughs did not have, nor did they convey to the Holoubeks, marketable title. Quite clearly, unless the Grubaughs are held to their representation and warranty to convey marketable title, the Holoubeks are buying a quiet title lawsuit to resolve what we have nicknamed the "problem." And, as Northouse v. Torstenson, supra, points out, the fact that the Holoubeks might prevail over Lord and Sypal, a matter upon which we neither express nor imply any opinion, is simply not material to the question of whether the Grubaughs had and conveyed marketable title. Without rescission, we would be forcing the Holoubeks to "buy a lawsuit." There is obviously reasonable doubt in law and in fact about the title to the Grubaugh property, and a reasonably prudent purchaser, well informed as to the facts and their legal consequences as outlined by Ronkar, would not accept such title under the warranty of marketable title contained in the contract.
Finally, although the evidence is undisputed that at the time of closing, no one, including Lord and Sypal, was aware of his or her potential claim to a portion of the Grubaugh tract, the Grubaughs did warrant that "no other persons ... will have any interest in the property being conveyed" and such provision also survived the closing. The record indisputably shows that Lord and Sypal have resisted all attempts, first by the Holoubeks and then by the Grubaughs, to amicably resolve the "problem." Thus, the foregoing quoted provision from paragraph 11(c) of the purchase agreement has clearly been breached. In short, at least on the record before us, it is quite apparent that the Lord-Sypal claim cannot be resolved without further litigation.
We now turn to several of the trial court's reasons for denying rescission. The trial court cites, apparently as a circumstance supporting the denial of rescission, the fact that "[t]he Purchase Agreement does not contain an express rescission clause." However, the law is clear that an implied agreement to rescind a contract may be given effect. Lustgarten v. Jones, 220 Neb. 585, 371 N.W.2d 668 (1985); Davco Realty Co. v. Picnic Foods, Inc., 198 Neb. 193, 252 N.W.2d 142 (1977). Clearly, a warranty of marketable *910 title, meaning that the facts or law do not put the title in doubt, would be worthless if such did not carry with it the implied remedy of rescission. In this regard, it is important that in equity, the lawsuit is not on rescission, but, rather, is for rescission, and thus it is a suit to have the court declare a rescission which is not accomplished in equity until the court so decrees. See Kracl v. Loseke, 236 Neb. 290, 461 N.W.2d 67 (1990), citing Dan B. Dobbs, Handbook on the Law of Remedies, Principles of Restitution § 4.8 (1973). Kracl v. Loseke, supra, further illuminates the equitable remedy of rescission, stating that when a court of equity grants rescission, its decree wipes out the instrument and renders it as though it does not exist. Accordingly, the fact that the agreement between the Grubaughs and the Holoubeks did not contain an express provision for rescission is of no moment, because such remedy is implied from and inherent in the warranty of marketable title, and rescission is the equitable relief that the court grants in the event of a breach of the warranty of marketable title.
We now turn to a specific finding of the trial court which is apparently a material part of the trial court's rationale in denying the Holoubeks relief: "The fact that the neighbors to the south make a claim to the southern 27 feet of the Tract does not defeat the object of the parties in making the agreement, and does not render the Tract bargained for uninhabitable for all practical purposes." This proposition, according to the trial judge's order, is derived from Eliker v. Chief Indus., 243 Neb. 275, 498 N.W.2d 564 (1993). However, examination of Eliker reveals that it is a completely different kind of case and that the doctrine found therein, and relied upon by the trial court here, is simply inapplicable to the instant case. Eliker involved an action brought to obtain rescission of a home construction contract, and the issue presented was whether the homeowners' remedy for defects in the home was in damages or equitable rescission. The contractor argued that damages would be an adequate remedy, but the Eliker court pointed out that in instances of failure of consideration, such is not generally a sufficient ground for equitable cancellation of a contract, but equitable cancellation, i.e., rescission, may arise from a breach of contract which is so substantial and fundamental as to defeat the object of the parties entering into the contract.
The Eliker court said:
Although [the contractor] asserts that the proper remedy for breach of a construction contract is damages rather than rescission, the existing case law does not preclude the application of an equitable remedy where a breach of the contract is so substantial that it defeats the object of the parties in entering into the agreement.
243 Neb. at 279, 498 N.W.2d at 567. The court further explained that a damage remedy contemplates that the contract has been substantially complied with and will serve substantially as well as would the structure if completed according to the contract and completion would not endanger the balance of the structure. The court, after reciting an extensive list of what would be needed to complete the house and make the repairs, said that "it is clear that the structure, as completed, does not serve the same purpose as it would have if completed according to the contract" and that "the variations between the house that the [homeowners] bargained for and the structure as completed were egregious." Id. at 281, 498 N.W.2d at 568.
It was in this context that the Eliker court held that "rescission is the proper *911 remedy where a breach of contract is so substantial and fundamental as to defeat the object of the parties in making the agreement, so that it leaves the property bargained for uninhabitable for all practical purposes." 243 Neb. at 285, 498 N.W.2d at 570.
Eliker did not involve a claim of a breach of a warranty of marketable title, but, rather, a breach of contract for the construction of a house, which even the contractor admitted had a flawed design and substandard workmanship causing it to effectively split in half. Thus, in Eliker, the choice was between remedies for an obvious breach of a home construction contract, whereas this action seeks equitable rescission because of a breach of the warranty of marketable title. As a result, this rationale for denying rescission expressed by the district court, citing a clearly distinguishable case, is incorrect.
The district court also reasoned as follows:
Even if the existence of the Disputed Area was considered a "defect" in title, [the Holoubeks] failed to allow [the Grubaughs] a reasonable time to cure the defect. [The Grubaughs] acted reasonably in attempting to resolve the issues when requested by [the Holoubeks] to do so. [The Holoubeks] brought this suit before a reasonable time had elapsed. The "defect" is one which could be cured if a reasonable time were allowed.
The trial court's opinion reveals that this rationale is derived from Fritsch v. Hilton Land & Cattle Co., 245 Neb. 469, 513 N.W.2d 534 (1994), as well as our discussion of Fritsch in Snowdon Farms v. Jones, 8 Neb.App. 445, 595 N.W.2d 270 (1999).
Snowdon Farms v. Jones, supra, is the opposite of the instant case, because the seller was attempting to use a title defect as a defense to the buyer's action for specific performance. We reversed the district court's order allowing the seller to rescind, finding that the district court's earlier journal entry had cured the main defect and that given the law's preference for specific performance, the buyer's motion for summary judgment had to be reconsidered. Of considerable note in Snowdon Farms is the fact that after the contract, and while the seller was purportedly attempting to cure the title defect, the land became more interesting and perhaps more valuable because a third party was harvesting topsoil from it. In Fritsch v. Hilton Land & Cattle Co., supra, the seller knew of a mortgage-related defect at the time of the agreement in 1981, but did nothing about it until 1984. As a result, the Nebraska Supreme Court found that there was a failure to cure the defect within a reasonable time and that thus, the seller could no longer insist upon performance by the buyer. The fact is, in this case, that neither the Holoubeks nor the Grubaughs were able to make any progress with Lord and Sypal to resolve the "problem." Moreover, the obvious remedy is a quiet title action, but there is no evidence that the Grubaughs ever instituted such. At oral argument, the Grubaughs' counsel asserted that they could not do so, because the Holoubeks had recorded the deedimplying a lack of standing. We need not decide whether the Grubaughs would have lacked standing, despite their contractual obligation, because any number of solutions to that potential issue would be easily apparent to a seller intent on fixing the "problem." And, the evidence is not convincing that the Grubaughs were seriously intent on resolving the "problem." In other words, lack of time to cure was not the issue.
Accordingly, the two cases relied upon by the district court are factually distinguishable. *912 Moreover, of significant import is the fact that in their answer, the Grubaughs make no assertion that they were not allowed a reasonable time to cure the defect. Moreover, the trial court's decision implies that there was insufficient timefrom awareness of the "problem" to the time of trialfor a quiet title action involving Lord and Sypal to be filed, but any such implied conclusion is obviously incorrect.
The final rationale of the district court for denying rescission is that "[the Holoubeks], in essence, acquiesced in or ratified the contract by attempting to settle the issue with the neighbors and by agreeing to make a settlement offer which would give up a portion of the property." The trial court's foundation for this rationale is Kracl v. Loseke, 236 Neb. 290, 461 N.W.2d 67 (1990), a case in which the purchasers (Kracls) of real property sought rescission of the written contract based on the concealment by the sellers (Losekes) of substantial termite damage in the residence. The trial court rescinded the contract, and the Nebraska Supreme Court affirmed. Losekes argued that the right to rescind was waived by Kracls because they made improvements to the house. The Supreme Court acknowledged that a purchaser's claim for rescission can be defeated by conduct showing acquiescence, ratification, or estoppel, citing a Maryland case, Wolin v. Zenith Homes, Inc., 219 Md. 242, 146 A.2d 197 (1959). The court recited four minor repairs made by Kracls totaling $93.88 made after discovery of the termite damage, and the court said that such repairs could hardly be considered acts which indicated Kracls' intent to ratify the contract with Losekes or acquiesce in the purchase of the house with the undisclosed termite damage.
The fact that the Holoubeks attempted to work with Lord and Sypal to arrive at an accommodation to allow them to proceed with the planned subdivision is by no means acquiescence to the notion that if Lord and Sypal tell the Holoubeks to "go fly a kite," they, as buyers holding a warranty of marketable title, are somehow agreeing that they will take on the responsibility and cost of a quiet title action, which obviously looms if Lord and Sypal reject the Holoubeks' offeras they did. Moreover, the district court's rationale is fundamentally at odds with our public policy favoring compromise of disputes. See Baker v. Blue Ridge Ins. Co., 215 Neb. 111, 337 N.W.2d 411 (1983).

CONCLUSION
For the foregoing reasons, we reverse the decision of the district court and remand the matter to the district court for entry of an order rescinding the agreement for sale of real estate between the parties executed December 29, 2004. Because the purpose of rescission is to place the parties in status quo, that is, to return them to their position which existed before the rescinded contract, see Kracl v. Loseke, supra, the district court shall consider the Holoubeks' claims for damages upon the record previously made.
REVERSED AND REMANDED WITH DIRECTIONS.
IRWIN, Judge, participating on briefs.